UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| TERESA B. WYMAN,<br><br>                     Plaintiff,<br><br>    vs.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social<br>Security,<br><br>                Defendant. | 4:17-CV-04174-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Teresa B. Wyman, seeks judicial review of the Commissioner's

final decision denying her application for social security disability and

supplemental security income disability benefits.[1]

_____

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB
benefits are sometimes called "Title II benefits." Receipt of both forms of
benefits is dependent upon whether the claimant is disabled.  The definition of
disability is the same under both Titles.  The difference–greatly simplified-is
that a claimant's entitlement to SSD/DIB benefits is dependent upon one's
"coverage" status (calculated according to one's earning history), and the
amount of benefits are likewise calculated according to a formula using the
claimant's earning history.  There are no such "coverage" requirements for SSI
benefits, but the potential amount of SSI benefits is uniform and set by statute,
dependent upon the claimant's financial situation, and reduced by the
claimant's earnings, if any.  There are corresponding and usually identical
regulations for each type of benefit.  See e.g. 20 C.F.R. § 404.1520 and
§ 416.920 (evaluation of disability using the five-step procedure under Title II
and Title XVI).  In this case, Ms. Wyman filed her application for both types of
benefits.  AR 24, 227-238.  Her coverage status for SSD benefits expired on
March 31, 2015.  AR 24, 274.  In other words, in order to be entitled to Title II
benefits, Ms. Wyman must prove she was disabled on or before that date.

Ms. Wyman has filed a complaint and has requested the court to reverse the Commissioner's final decision denying her benefits and to enter an order awarding benefits (Docket 17). Alternatively, Ms. Wyman requests the court remand the matter to the Social Security Administration for further proceedings. Id.

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter is before this magistrate judge pursuant to the consent of the parties. See 28 U.S.C. § 636(c).

## FACTS[2]

### A.    Statement of the Case

This action arises from plaintiff, Teresa B. Wyman's, application for SSDI and SSI filed on September 21, 2014, alleging disability since August 1, 2009, due to borderline personality disorder, fibromyalgia, major depressive disorder recurrent, depression, migraines, insomnia, anxiety, post-traumatic stress disorder ("PTSD"), interstitial cystitis, irritable bowel syndrome with chronic

_____

[2] The following statement of facts is taken from the parties' joint stipulated statement of facts. See Docket No. 15. The court has made minor modifications such as grammar and punctuation. There was a separate statement of disputed facts. See Docket No. 15 at p. 29. The court has incorporated those statements chronologically with the rest of the facts, but indicated they are disputed.

constipation, right knee arthritis, gastroesophageal reflux disease ("GERD"), and extreme fatigue.  AR27, 227, 237, 281, 283 (citations to the appeal record will be cited by "AR" followed by the page or pages).

Ms. Wyman's claim was denied initially and upon reconsideration. AR140, 148, 155.  Ms. Wyman then requested an administrative hearing. AR162.

Ms. Wyman's administrative law judge hearing was held on April 18, 2016, by Brenda Rosten ("ALJ").  AR48.  Ms. Wyman was represented by other counsel at the hearing, and an unfavorable decision was issued on September 2, 2016.  AR21.

At step one of the evaluation, the ALJ found Ms. Wyman had not engaged in substantial gainful activity ("SGA"), since the date of her alleged onset of disability, August 1, 2009, and that she met the insured status for her SSDI claim through March 31, 2015.  AR26.

At step two, the ALJ found Ms. Wyman had severe impairments of obesity, advanced chondromalacia of the right knee, fibromyalgia, chronic abdominal pain secondary to polycystic ovary syndrome, major depressive disorder, borderline personality disorder and PTSD.  AR27.

The ALJ also found Ms. Wyman had medically determinable non-severe impairments of gastroesophageal reflux disease and migraines.  AR27.

At step three, the ALJ found Ms. Wyman did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App 1 (20 CFR § 416.920(d), 416.925, and 416.926) (hereinafter the

3

"Listings"). AR27. The ALJ found Ms. Wyman had mild limitations in activities of daily living, moderate limitations in social functioning, and moderate difficulties with concentration, persistence or pace. AR28. The ALJ noted Ms. Wyman received inpatient psychiatric care at Avera Behavioral Health for one week in June 2015, but found it was not an episode of decompensation of extended duration. AR28.

In evaluating whether Ms. Wyman met or medically equaled a Listing, the ALJ stated it examined all the listed impairments and specifically considered Listings § 1.02A (major dysfunction of a joint –major peripheral weight bearing joint such as the hip, knee or ankle) and § 1.02B (major dysfunction of a joint—major peripheral joint in the upper extremity, i.e. shoulder, elbow or wrist/hand). In evaluating whether Ms. Wyman met or medically equaled a Listing the ALJ did not state in the decision whether it considered if Ms. Wyman's fibromyalgia medically equaled a Listing (for example, Listing § 14.09D in the listing for inflammatory arthritis), or whether Ms. Wyman's fibromyalgia medically equaled a Listing in combination with at least one other medically determinable impairment. AR27-29. (The commissioner disputes that this sentence constitutes a material fact).

The ALJ also considered whether Ms. Wyman met Listings § 12.04 (affective disorders); § 12.06 (anxiety disorders); and § 12.08 (personality disorders). AR27. The ALJ found Ms. Wyman did not meet any of these listings because she failed to satisfy the "B" or "C" criteria for these mental impairments. Id. (These facts regarding the ALJ's consideration of the mental

impairment Listings were not noted or stipulated to by the parties, but are noted by the court.).

The ALJ determined Ms. Wyman had the residual functional capacity, ("RFC"), to perform:

> less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: lift and/or carry 10 pounds occasionally and less than 10 pounds frequently. Sit about 6 hours in an 8-hour workday, and stand and/or walk combined for about 4 hours in an 8-hour workday. She cannot operate foot controls with her R lower extremity. The claimant can never climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs using a handrail. The claimant can occasionally balance, and stoop, and can rarely (defined as 1-5% of a workday) kneel, crouch, and crawl. She can have no exposure to work around hazards, such as unprotected heights and fast and dangerous moving machinery. Mentally, the claimant is limited to simple tasks. She can maintain concentration, persistence and pace for 2-hour segments. She can respond appropriately to brief and superficial interactions with the general public.

AR29.

The ALJ considered the mental medical source statement completed by Ms. Wyman's treating mental health PA-C, Rachelle Broveleit, and noted Ms. Broveleit's opinions, if accepted, would likely support meeting a Listing for Ms. Wyman's mental health impairments. AR35-36. The ALJ gave Ms. Broveleit's opinion little weight because she was a non-acceptable treating medical source,[3] because her opinion appeared to be based on Ms. Wyman's

---

[3] At the time of the decision, physician assistants were not considered acceptable medical sources under SSA's regulations. Physician assistants were added as acceptable medical sources in March, 2017. See https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html.

subjective complaints, and because the limitations were disproportionate to Ms. Wyman's level of treatment. AR36-37. The ALJ also noted Ms. Broveleit completed the form with Ms. Wyman's assistance and the conclusions appeared to be based on subjective complaints and not objective findings. AR36-37. The ALJ's credibility finding regarding Ms. Wyman's statements concerning the intensity, persistence and limiting effects of her symptoms was that they were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR30. The commissioner disputes that this sentence constitutes a material fact.

Based on the RFC determined by the ALJ, the ALJ found Ms. Wyman was not capable of performing any past relevant work. AR37-38.

At step five, relying on the testimony of a vocational expert, the ALJ found there was other work Ms. Wyman could perform including final assembler with 250 jobs in the region, printed circuit board screener with 300 jobs in the region, and stone setter with 250 jobs in the region. AR38-39. The vocational expert defined the region to include North Dakota, South Dakota and Minnesota. AR39.

Ms. Wyman timely requested review by the Appeals Council (AR214), and submitted new and material evidence to the Appeals Council consisting of:

a. Medical records from Sanford Clinic Family Medicine: letters from Ms. Wyman's treating physician dated September 6, 2016, and October 14, 2016, in which Dr. Jensen stated that due to Ms. Wyman's complex conditions and chronic pain she did not recommend that Ms. Wyman work at this time,

and that Ms. Wyman had been unable to work the last six years due to her medical problems.  See AR16-20.  The Appeals Council stated it did not think this evidence showed a reasonable probability of changing the outcome of the decision so it did not consider and exhibit the evidence.  AR2.

b.     AR20 is blank.  Before any of Ms. Wyman's additional evidence, AR8-20, was presented to the Appeals Council Officers who declined to review the ALJ's decision, an SSA employee scanned the blank side of Dr. Jensen's letter on this one page (AR2-4, 20).  Thus, the Appeals Council only saw AR20 as a blank sheet.

c.     Ms. Wyman will attach the entire two page letter from Dr. Jensen, including the printed side of AR20 to her brief, but the printed side was not before the Appeals Council.[4]

d.     Student Loan Discharge Application and finding of total and permanent disability by the US Department of Education, dated November 1, 2016, which included a physician's certification from Dr. Jensen stating Ms. Wyman was unable to perform substantial gainful activity and identifying numerous mental and physical limitations.  AR9-12.  The Appeal Council stated because the evidence was dated November 1, 2016, it did not affect the decision, which was decided September 2, 2016.  AR2.

---

[4] See attachment to Docket No. 18.

The Appeals Council denied Ms. Wyman's request for review making the ALJ's decision the final decision of the Commissioner. AR1. Current counsel then began to represent Ms. Wyman and this action was timely filed.

**B.      Plaintiff's Age, Education and Work Experience**

Ms. Wyman was born in February, 1974, and completed four or more years of college. AR237, 279.

The ALJ identified Ms. Wyman's past relevant work as a secretary, resident care aide, child monitor, stock clerk and fast food worker. AR38.

The state agency found Ms. Wyman's work at DSS and Wal-Mart to be unsuccessful work attempts. AR305.

Ms. Wyman also identified part-time work during a six-week assessment at Goodwill Industries in 2015 arranged by Vocational Rehab Services. AR342, see also AR360.

**C.      Relevant Medical Evidence**

**1.      Sanford Family Medicine Clinic**

Ms. Wyman was seen on April 27, 2008, for abdominal pain, fever, diarrhea and nausea. AR409. She was referred to a specialist and ultimately diagnosed with biliary dyskinesia or chronic inflammation of her gallbladder. AR401, 403.

Ms. Wyman was seen on November 3, 2008, with continued abdominal pain and fever. AR441. She reported fatigue, aches all over, nausea and occasional vomiting, and her gallbladder had been removed six weeks earlier. AR441. She was taking Prozac for depression but did not feel it was related to

the abdominal pain, although she had contacted the clinic because she did not feel the Prozac was working and her dosage had been increased on October 15, 2008. AR432, 441.

Ms. Wyman was seen on April 14, 2009, with continued abdominal pain symptoms, additional labs were ordered, but Glenn Ridder, M.D., noted many things had been tried without avail. AR452. Dr. Ridder wrote, "she is 'sure' there is something wrong and I am not so sure." AR452. Dr. Ridder then wrote, "May need to go back to the GA doc for further eval and tx." AR452. The lab test revealed abnormal findings in bacteria and mucus, but the record includes no discussion of the abnormal results. AR458. Dr. Ridder's office contacted her on April 15, 2009, and told her the tests were normal. AR466.

Ms. Wyman contacted the clinic on July 23, 2009, and requested that she be switched back to Zoloft from Prozac because "she feels crazy and not right at all." AR485. Her Prozac was discontinued and Zoloft was prescribed. AR485.

Ms. Wyman was seen at the Sanford Family Medicine Clinic on November 9, 2009, for follow-up of depression and anxiety and her symptoms were not well controlled with her medications. AR697. Complaints included crying, headaches, poor motivation, no energy, whole body pain, suicidal ideation without a plan, and being unable to work with her fibromyalgia. AR697. The mental status exam was recorded as normal. AR698. Levaquin, Cymbalta, and Ultram were added with samples given for each. AR698.

Ms. Wyman was seen on November 24, 2009, for her depression and reported no longer being suicidal, but was not a lot better yet. AR497. Dr. Ridder stated, "She is having some improvement with the depression. She is not suicidal any longer at this time but not a lot better yet." AR497. Dr. Ridder found in the mental status exam that she was oriented, with normal thoughts, speech, affect, and mood. AR497. He stated, "She is almost smiling." AR497.

On January 12, 2010, Ms. Wyman contacted the clinic to request samples of Cymbalta because she did not have insurance or any money. AR695-96.

Ms. Wyman was seen on March 8, 2010, and she reported that she continued to have some suicidal ideation, lethargy and insomnia. AR694-95. Her mental status exam was again recorded as normal, but her Cymbalta dosage was increased to see if symptoms improved. AR695. Dr. Ridder stated that Mr. Wyman "does look better than I have seen her for quite a while." AR695. He described Ms. Wyman as alert, oriented, and having normal mood and thought content. AR695.

Ms. Wyman contacted the clinic on March 25, 2010, and requested that her Cymbalta dosage be increased because the current dosage was not helping much and asked for something to help her sleep because Benadryl and melatonin were not helping. AR529. Her Cymbalta dosage was increased and Ambien prescribed for sleep. AR530. Ms. Wyman reported improved symptoms after adding Abilify on April 15, 2010. AR538.

Ms. Wyman was seen on May 26, 2010, for complaints of bilateral leg pain from hips down. AR691. She said that she had arthralgia/fibromyalgia for several years and her pain was in all extremities especially in the legs the last few weeks. AR691. Her diagnoses at that time included depression, fibromyalgia, borderline personality disorder, PTSD, migraine, GERD, and insomnia. AR691. Ms. Wyman said she had had tenderness and limited range of motion ("ROM") of both knees on exam. AR691. Ms. Wyman's back had good flexion and extension, a normal range of motion, and some mild diffuse tenderness. AR691.

Ms. Wyman was seen on September 30, 2010, for depressive symptoms, which included depressed mood, agitation, anhedonia, anxiety, diminished interest in activities, diminished concentration, fatigue, feelings of worthlessness, insomnia, recurrent thoughts of death, suicidal thoughts with a specific plan, and weight gain. AR689. She had stopped taking Abilify because of side effects. AR689. Her mental status exam was again recorded as normal; she was alert and oriented, with normal thought content, speech, affect, and mood. AR690. Dr. Ridder stated that Ms. Wyman had no pain, redness, or swelling in her joints. AR689. Dr. Ridder observed, "she seems to [sic] pleasant to be either **suicidal** seriously and is not convincing that she is ready to go soon to do anything about it." AR690. She was referred for both psychiatric and psychological consults, and urged to present herself to Behavioral Health Services immediately due to her suicidal thoughts. AR690.

11

Ms. Wyman was seen on March 29, 2011, for follow-up on weight concerns and right knee pain. AR685. Knee exam revealed antalgic gait, tenderness, mild effusion, reduced ROM, and positive Lachman sign. AR686. An x-ray was unremarkable and a prednisone injection was given. AR686. Following the injection, her knee had been somewhat better, but was starting to bother her again by April 28, 2011. AR684.

Ms. Wyman was seen on October 2, 2012, for follow-up on her fibromyalgia and depressive symptoms. AR652. She reported depressed mood, agitation, fatigue, insomnia, headaches with neck stiffness and some chest discomfort with stress and trigger point pain. AR652. Dr. Ridder's notes stated, "Teresa notes mild generalized fatigue, somewhat chronic. There's been no weight loss or fever or other localizing symptoms. Exam shows no specific findings to suggest a clear cause." AR652. Ms. Wyman's musculoskeletal exam showed no pain, redness or swelling on the joints and her neurologic exam showed no chronic headaches or neurological abnormalities. AR652-53. Her extremities were normal. AR652. Her pain was generalized pain scattered about her trunk and extremities. AR652. Her medications were adjusted and it was felt her symptoms were likely related to her fibromyalgia. AR653. Ms. Wyman contacted the clinic a few days later due to her pain and asked about Neurontin or Lyrica. AR650. She was referred to the rheumatology clinic. AR646.

Ms. Wyman contacted the clinic on June 3, 2013, regarding a migraine and was prescribed Imitrex. AR631.

Ms. Wyman contacted the clinic on September 19, 2013, complaining of low back pain, fatigue and nausea and vomiting. AR603. Examination showed abdominal tenderness and no CVA tenderness "other than her usual with her fibro." AR603. Dr. Ridder noted that "Reviewed her meds and she is not the greatest at contin [sic] to take them." AR603.

Ms. Wyman was seen by Dr. Jensen on November 19, 2013, to follow-up her pyelonephritis[5] and reported right knee pain, fever and nausea, chronic fatigue, increased migraines and fibromyalgia. AR597. Dr. Jensen increased her Tramadol dosage and recommended an increased dosage of Neurotin, but Ms. Wyman refused the increased Neurontin due to problems with weight gain. AR598. Dr. Jensen noted her mental status as depressed mood, and Ms. Wyman's PHQ-9 score was 25, which was in the severe depression range. AR596-97. When seen three days later, Ms. Wyman still reported pain and pressure in the left flank, but was much better, which she attributed to the Neurontin. AR594.

Ms. Wyman saw Dr. Jensen on February 11, 2014, for her fibromyalgia and Ms. Wyman noted worsening symptoms since running out of Neurontin. AR581. She said her pain was also worse with exertion, stress, lack of sleep,

---

[5] Pyelonephritis is a sudden and severe kidney infection. It causes the kidneys to swell and may permanently damage them. Pyelonephritis can be life-threatening. See https://www.healthline.com/health/pyelonephritis (last checked August 22, 2018). (This footnote was added by the court).

13

and weather changes. AR581. Her Tramadol was stopped and cyclobenzaprine added by Dr. Jensen. AR582.

On June 5, 2014, Ms. Wyman contacted the clinic to refill her Imitrex prescription, and had it refilled again on August 15, 2014. AR561, 567. She was seen on June 13, 2014, for her fibromyalgia and reported chronic generalized pain, fatigue, sleep/mood disturbances, headaches, IBS, multiple tender points with her pain worse with exertion, stress, lack of sleep or weather changes. AR566. Dr. Jensen characterized these as classic fibromyalgia symptoms. AR566. Her Flexeril was discontinued and Neurontin dosage was doubled. AR567. Following her appointment with Dr. Jensen, she met with a nurse to address weight loss. AR565. Her weight at that time was around 255 pounds. AR565.

Ms. Wyman was seen on July 1, 2014, for tension headaches along with sinus pressure and drainage she said had been continuing for several days. AR564. She had purulent drainage, a sore throat, and a productive cough. AR564. Dr. Jensen diagnosed sinusitis and prescribed antibiotics. Dr. Jensen also "heartily congratulated" Ms. Wyman on an excellent job with lifestyle changes and successful management of her medical condition. AR564.

Ms. Wyman contacted the clinic on July 9, 2014, about a medication she needed and was described as crying and stating she was suicidal. AR563. Ms. Wyman reported that she was "going through withdrawal" and was out of medication. AR563.

Ms. Wyman contacted the clinic on September 29, 2014, after being seen in the Brookings Orthopedic clinic and requested a referral for a knee brace. AR559.

Ms. Wyman was seen on November 11, 2014, to follow-up on her ruptured ovarian cyst and left lower quadrant pain. AR818. She said she had pain, chronically loose stools, and nausea and fevers. AR818. An abdominal CT scan showed degenerative spurring of the spine, and no gastric abnormalities, but did show evidence of a ruptured cyst. AR819. Dr. Jensen felt the ovarian cyst to be the cause of her abdominal pain. AR820.

Ms. Wyman's physical therapy notes from November 5, 2014, stated that Ms. Wyman has been progressing well in physical therapy despite four missed appointments due to illness and other health issues. AR821. She had normal gait patterns, a normal range of motion in her right knee, and an easier time climbing stairs. AR821.

Ms. Wyman was seen on November 18, 2014, to follow-up on her ruptured ovarian cyst with ongoing symptoms including pain, fatigue, nausea, and chronic constipation. AR816. She also complained of tension in her neck and more frequent migraines. AR816. Ms. Wyman also continued to have physical therapy on her knee in November and December. AR816. Her physical therapy ended on December 8, 2014, when she cancelled her future appointments because she said that she kept injuring herself and was in too much pain to continue with therapy. AR811.

Dr. Jensen referred Ms. Wyman for physical therapy beginning January 20, 2015, due to neck pain and chronic headaches. AR805. The physical therapist's subjective history noted a long history of neck pain, headaches, and fibromyalgia limiting her activities of daily living and ability to work, but previously she had been able to do housework and self-care independently. AR805-06. Ms. Wyman reported that typically she got headaches three times per week, and numbness and tingling in her hands, right more than left, especially when waking in the morning. AR806. The physical therapist's examination revealed limited hip ROM, positive adduction drop tests bilaterally, limited cervical rotation to the left, tenderness over the neck, and that she was very hypermobile. AR806.

Dr. Jensen saw Ms. Wyman on July 10, 2015, for follow up after her inpatient psychiatric treatment at Avera for suicidal ideation. AR992. Dr. Jensen's note stated, "Patient had suicidal ideation but is improving with depression and fatigue since discharge." AR992. Dr. Jensen's diagnosis was depression with suicidal ideation. AR992.

Ms. Wyman was seen on November 10, 2015, for follow up on her right knee and medications. AR997. She had been in physical therapy for her knee from July 24, 2015, through August 21, 2015, having two therapy sessions. AR914-17.

Ms. Wyman's migraine medication, Imitrex, was refilled on February 12, 2016. AR1064. In addition to the Imitrex, Ms. Wyman's medications at that

time included Wellbutrin, Zoloft, Vyvanse, Ultram, Trazodone, Tylenol, Neurontin, Celebrex, Zofran, Prilosec, and Ibuprofen.  AR1065-66.

Ms. Wyman's migraine medication, Imitrex, was refilled again on April 7, 2016, and again on May 3, 2016.  AR1147, 1167.

Ms. Wyman saw Dr. Jensen on May 10, 2016, for follow up on her fibromyalgia and had ongoing symptoms of chronic generalized pain, fatigue, sleep/mood disturbances, headaches, IBS, and tender points.  AR1172.  She reported taking Tramadol at greater than the prescribed dosage due to pain, that Celebrex was making her sleepy, and that she was taking the maximum dosage of Neurotin, which was giving her dry mouth. AR1172.  Ms. Wyman said her pain was worse with exertion, stress, lack of sleep and weather changes, and Dr. Jensen wrote that her history was not suggestive of other disorders such as rheumatoid arthritis, osteoarthritis, or systemic lupus erythematosus ("SLE").  AR1172.  Ms. Wyman's mental status was normal, as were her extremities.  AR1174.  Celebrex was discontinued and Flexeril prescribed, as well as either Tylenol 650 mg q.i.d. or Tramadol 75 mg q.i.d. AR1175.

On September 6, 2016, after the ALJ's decision, but before the Appeals Council review, Ms. Wyman's treating physician, Dr. Jensen, wrote a letter regarding Ms. Wyman's condition and stated Ms. Wyman had been unable to work the last six years due to her medical problems including fibromyalgia, borderline personality disorder, PTSD, migraines, GERD, insomnia, obesity, anxiety, major depressive disorder, recurrent, chronic pelvic pain, urinary

urgency, and chronic constipation. AR19. Dr. Jensen stated that the letter was to confirm that Ms. Wyman's medical status had not changed and that she continued to recommend against working outside the home. See page two of Dr. Jensen's letter attached to Ms. Wyman's brief at Docket No. 18. The letter included in the original transcript was notated as page one of two, but the transcript provided by SSA is missing the second page of the September letter, which shows as a blank page. AR20.

On October 14, 2016, Ms. Wyman's treating physician, Dr. Jensen, wrote a second letter regarding Ms. Wyman's condition and stated that Ms. Wyman had been a patient of hers for three years and due to the complexity of Ms. Wyman's conditions (again listing the same diagnoses as listed in the September 6, 2016, letter) and chronicity of her pain, Dr. Jensen did not recommend that Ms. Wyman work at this time. AR17.

**2.      Sanford Orthopedics & Sports Medicine Clinic:**

Dr. Reynen saw Ms. Wyman for right knee pain on February 21, 2012, at the orthopedic clinic. AR672, 674. Exam revealed Ms. Wyman's knee was quite large with tenderness, significant crepitus, and McMurray's testing caused significant discomfort. AR674. X-rays were essentially normal. AR674. An MRI was obtained which revealed prominent changes of osteoarthritis. A knee scope and debridement surgery was planned. AR671, 732. Paul Reynen, M.D., performed the surgery and his postoperative diagnosis was articular surface degeneration of patellofemoral joint and medial compartment. AR669.

Dr. Reynen saw Ms. Wyman on August 1, 2012, for follow up on Ms. Wyman's right knee. AR657. She reported being pain free at the exam, but she stated that the pain increased to 7/10 if she was on her knee too much or if it was bent or straight too long. Id. Exam confirmed crepitus and physical therapy was ordered. Id.

Ms. Wyman was seen at the Brookings Orthopedic clinic on February 3, 2014, for complaints of right knee pain worse with extended standing or stairs, and she reported she had three falls in the last 17 months. AR584. X-rays revealed significant medial joint space narrowing of the right knee. AR584, 705. The impression was significant internal derangement with crepitance of the right knee and an MRI was ordered. AR584. The MRI revealed moderate medial compartment arthritis with high-grade cartilage irregularity, and additional irregularities, but no stress fracture or dead bone and the knee arthroscopy surgery was planned. AR581, 702.

Ms. Wyman was seen at the Brookings Orthopedic clinic on September 29, 2014, and reported that following her debridement surgery the prior Spring, her knee had been doing reasonably well until her knee was struck by a bike, and had then gotten progressively worse. AR558. Dr. Reynen's exam revealed discomfort with ROM testing, and tenderness. AR558. X-rays revealed degenerative changes bilateral knees with moderate to marked medial joint space narrowing on the right and mild narrowing on the left. AR700. Spurring was also noted with the predominant finding of osteoarthritis. AR700. Physical therapy and a knee sleeve were planned and the knee was

injected with Kenalog and Marcaine.  AR558, 827-29.  (October 13, 2014, initial physical therapy evaluation – rehabilitation potential was fair).

Ms. Wyman was seen on December 10, 2015, for right knee pain by PA Krempges and orthopedist, Chad Kurtenbach, M.D.  AR1000, 1002.  The PA's examination revealed trace effusion and tenderness.  AR1000.  X-rays were obtained and the PA's impression was bilateral degenerative joint disease right greater than left, and he recommended conservative treatment including activity modification, rest, anti-inflammatories, physical therapy, knee brace, and periodic injections.  AR1001-02.  The PA discussed knee replacement with Ms. Wyman but stated that at her young age, additional replacement would likely be needed in the future.  AR1001.  Dr. Kurtenbach also performed an exam and reviewed the x-ray which revealed osteoarthritis bilaterally, most significant on the right knee, and he also discussed treatment options and recommended conservative treatment including activity modification, rest, anti-inflammatories, physical therapy, and periodic injections.  AR1002. Dr. Kurtenbach also discussed surgical knee replacement and noted it was complicated by Ms. Wyman's young age.  AR1002.

Ms. Wyman was seen on January 20, 2016, by Dr. Bechtold for right knee pain.  AR1017.  She reported swelling, pain at rest and worse pain with use such as prolonged standing and stairs, and that her knee pain limited her daily activities.  AR1018.  She was quite anxious during the exam and somewhat hypersensitive to palpation about the knee and ROM, and had some varus alignment and thrust ambulation, and grinding, clicking and locking

symptoms were present.  AR1017.  The exam also revealed swelling, joint tenderness, and positive McMurray's test and positive crepitation tests. AR1019.  Dr. Bechtold recommended conservative care and discussed a stationary bike, an elliptical machine, or pool therapy as excellent exercises to do to relieve joint stress.  AR1019-20.  He also recommended Stepping Up To Wellness to help with weight reduction and improve mobility.  AR1020.  A total knee replacement was discussed, but Dr. Bechtold noted that Ms. Wyman's multiple comorbidities make her highly at risk for uncertain outcome, and another injection was recommended and administered.  AR1017-18.  He stated he would "try to give her tools to improve her status, but she will definitely need to take ownership on her own largely."  AR1017.  Ms. Wyman reported on February 6, 2016, that the injection helped a lot for the first week or so, but her right knee had started hurting again.  AR1039.

In March, 2016, Carl Bechtold, M.D., saw Ms. Wyman for complaints of right knee pain that she claimed prevented her from walking to her living room from her bathroom or kitchen.  AR1094.  He was concerned about her request for knee surgery because he thought her psychiatric issues and fibromyalgia were known risk factors for a poor outcome.  AR1095.  He characterized Ms. Wyman as "catastrophizing" with regard to her knee, and he opined that her described pain severity and dysfunction were not consistent with her amount of arthritis.  AR1095.  Ms. Wyman reported her prior injection helped for about a week and a half, but now she was doing "horrible" and could not even walk around her house due to pain.  AR1094.  Examination by

Dr. Bechtold revealed tearful and anxious affect, very antalgic gait with a pronounced limp, tenderness to fairly gentle palpation of the knee, intact but painful strength, but good ROM. AR1094-95. Dr. Bechtold discussed a total knee replacement, but stated she had a number of red flags for a poor outcome including her psychiatric issues and fibromyalgia. AR1095. Ms. Wyman was very frustrated and crying, and an MRI was ordered. AR1095. In March, 2016, Matthew Hayes, M.D., stated the MRI of Ms. Wyman's right knee showed mild to moderate chondromalacia, small effusion, mild synovitis, tiny debris in the joint space, mild tendinopathy without tear, and minimal inflammation. AR1112. Dr. Hayes also stated the MRI revealed advanced medial compartment chondromalacia with mild stress changes in the femur, peripheral extrusion of the meniscus with fraying of the posterior horn/root without definite acute intrameniscal tear, and mild/moderate patellofemoral chondromalacia. AR1112. Dr. Bechtold recommended continued conservative management and the Stepping Up To Wellness program. AR1118. On March 18, 2016, Dr. Bechtold stated he saw no new findings to explain the severity of her pain. AR1118.

### 3. Sanford Rheumatology Clinic

Ms. Wyman was seen on October 18, 2012, for her fibromyalgia by rheumatologist, Justina Tseng, M.D. AR646. Exam revealed tender points bilaterally in the trapezius, elbow, gluteal, knee distribution and positive anserine bursitis. AR649. Dr. Tseng's assessment was generalized myalgias, headaches, tender points, IBS symptoms, and fatigue consistent with

fibromyalgia. AR650. Exercise, sleep hygiene, and stress management were recommended for her fibromyalgia. AR650.

### 4. Sanford Hospital

Ms. Wyman was treated in the emergency room for a severe migraine with vomiting on March 27, 2009. AR389. She stated that she was getting the headaches monthly. AR389.

Ms. Wyman was treated in the emergency room for a migraine, which was described as recurrent problem on July 5, 2009. AR386.

Ms. Wyman contacted the hospital on July 28, 2013, and reported pain all over her body with painful joints and muscles and neck pain, causing headache. AR628. She was told to go to the emergency room. AR629. Ms. Wyman presented to the hospital and was admitted with a fever and body aches, headache and shortness of breath. AR612. She was diagnosed with left pyelonephritis, treated with Levaquin and discharged on July 30, 2013. AR615, 620, 624. Ms. Wyman returned to the emergency room on August 1, 2013, due to chest symptoms. AR610. She was diagnosed with atypical chest pain and told to follow up with her physician. AR611.

Ms. Wyman presented to the hospital on October 29, 2013, and was again diagnosed with pyelonephritis. AR599, 601.

### 5. Sanford Gastroenterology Clinic

Ms. Wyman was seen at the gastroenterology clinic for abdominal pain and heartburn or reflux on April 29, 2009. Her medical history at the time included fibromyalgia, depression, anxiety, and migraines. AR374. She was

treated with Prilosec for her reflux and given amitriptyline for her abdominal pain following an upper endoscopy.  AR372, 375-76.

Ms. Wyman was seen on December 17, 2014, to follow up on her ovarian cyst, pelvic pain, diarrhea, and a desire for an oophorectomy.  AR967.  Her noted medical history included complex pelvic pain, interstitial cystitis, and high-tone pelvic floor myalgia.  AR967.  The doctor did not believe removal of her remaining ovary would resolve any of her issues and she was referred to physical therapy for her pelvic issues.  AR968.

### 6.    Sanford Psychiatry and Behavioral Health Records

Ms. Wyman was seen on May 17, 2012, and July 24, 2012, for counseling sessions and reported things were going quite well.  AR661, 664. The counseling note stated, "She described how she is in a new relationship and discusses specifics in that regard, explored the new relationship and how Teresa is handling it. Things at this point are going extremely well and for that she is very grateful."  AR664.  Ms. Wyman had just completed a semester and was happy and optimistic.  AR664.  On November 2, 2012, Ms. Wyman reported to Evelyn Dennison, M.D., that she was doing well.  AR644. Dr. Dennison noted that her family practice physician had added 150 mg of Wellbutrin apparently to help with some of her pain issues.  AR644. Dr. Dennison stated in the mental status exam that Ms. Wyman's mood was euthymic, her thoughts were logical and linear, and her attention, concentration, insight and judgment were good.  AR644-45.

24

Ms. Wyman was seen for a psychiatric medication management visit on July 27, 2012.  AR659.  She reported doing better since her school session had ended when she had been feeling anxious and stressed.  AR659.  Her medications, which included Wellbutrin, dextroamphetamine, trazodone, and Cymbalta were continued.  AR660.

Ms. Wyman had additional counseling sessions on August 13, 2012; September 17, 2012; October 4, 2012; October 18, 2012; November 29, 2012; January 7, 2013; February 12, 2013; March 5, 2013; March 14, 2013; and April 12, 2013.  AR634-36, 638, 641-42, 645, 651, 654-55.

In February 2013, Dr. Dennison described Ms. Wyman as having a depressed mood, logical thoughts, and good attention, concentration, insight and judgment.  AR640.

Ms. Wyman was seen for a psychiatric medication management visit on May 17, 2013, and she reported occasionally having some suicidal thoughts without intent, and had quit taking two medications due to side effects. AR632.  Her Wellbutrin dosage was increased.  AR633.

Ms. Wyman was seen for counseling on June 5, 2013, and reported increased headaches.  AR630.  She had additional counseling sessions on July 17, 2013; August 16, 2013; August 26, 2013; September 30, 2013; November 11, 2013; November 25, 2013; December 9, 2013; January 6, 2014; January 30, 2014; February 18, 2014; and March 10, 2014.  AR574, 577, 585, 587, 592-93, 598, 602, 605-06, 629.

On July 17, 2013, Rhonda Smith, Ed.D., described Ms. Wyman as coping quite well. AR629. She "will be finishing school soon and that is a huge accomplishment for her." AR629.

Ms. Wyman was seen for a psychiatric medication management visit on August 16, 2013, by Rachelle Broveleit, PA-C. AR607. Ms. Wyman reported not knowing whether the increased dosage of Wellbutrin was helpful, having chronic pain and fatigue, and some anxiety that was overall pretty well managed. AR608. She also reported varying mood, sadness, anger, irritability at times, difficulty concentrating, and low energy. AR608. Her GAF was assessed at 65. AR609.

In November 2013, Ms. Wyman told Dr. Smith she had just had a good visit with her brother and his two children. AR598. Ms. Wyman was contemplating going back to work, although she was not sure she could work – full-time. AR598.

Ms. Wyman was seen for a psychiatric medication management visit on February 7, 2014, and reported struggling with her mood, anger, irritability, poor sleep, poor appetite, poor concentration, and low energy and motivation. AR582-83. She was started on Wellbutrin XL to try to improve her mood. AR583.

Ms. Wyman was seen for a psychiatric medication management visit on May 27, 2014. AR568. She was continuing with individual counseling, was seeing Amber Chan for therapy, and doing group counseling sessions. AR568.

Her Vyvanse dosage was increased to try to improve her concentration and energy.  AR569.

Ms. Wyman was seen for a psychiatric medication management visit on July 31, 2014, and was seeing Amber Chan for therapy every other week and doing group counseling sessions.  AR561.  Ms. Wyman reported her emotions had been up and down quite a bit, she had been having suicidal thoughts without a plan.  AR561.  Ms. Wyman told Rachelle Broveleit, P.A., that she felt rested and had lost 10 pounds.  AR561.  Ms. Wyman was swimming and cleaning for exercise and reported a fair ability to concentrate.  AR561.  She reported her energy level was improving. AR561.  Ms. Broveleit observed that Ms. Wyman was cooperative, pleasant, and had a euthymic to a bit depressed mood.  AR562.  Ms. Wyman's insight and judgment were good and her thought processes were coherent and goal directed.  AR562.  Ms. Wyman maintained good concentration during the appointment.  AR562.

Ms. Wyman was seen for a psychiatric medication management visit October 1, 2014.  AR556.  She reported she had become frustrated with her group therapy and quit. Id.  She later tried to go back, but the therapist wanted to speak to her first, and she "freaked out and quit again." Id.  This led to a serious breakdown and becoming fairly suicidal, but she had improved and was lately just having fleeting suicidal thoughts.  Id.

Ms. Wyman was seen for individual counseling on October 17, 2014, and had additional sessions on October 30, 2014; November 6, 2014; November 13, 2014; January 28, 2015; March 2, 2015; March 10, 2015; March 17, 2015;

April 6, 2015; May 18, 2015; and June 22, 2015.  AR817, 820, 822, 825, 971, 975, 977, 979, 982, 986, 988.

In November 2014, Ms. Wyman told Dr. Smith that if her social security disability came through "she would like to buy an inexpensive trailer close to her parents and work part time. . ."  AR820.  Dr. Smith wrote, "[a]t this time Teresa is hoping to get disability.  She feels that [it] is what needs to happen.  It is unsure what grounds she is using for that but she does complain of a lot of physical health issues."  AR820.

In the March 17, 2015, therapy notes, Ms. Wyman reported she was starting a 6-week rehab program at Goodwill.  AR979.  Ms. Wyman planned to work approximately 10 hours because she did not want it to impact her food stamps or other benefits.  AR979.  At the April 6, 2015, therapy session, she reported she had tried to do some work but had problems and was not able to continue.  AR982.  At the May 18, 2015, counseling session, Ms. Wyman told Dr. Smith, "I gave up working."  AR986.  Ms. Wyman stated she was planning to start a training program to earn extra income at Goodwill, but she did not feel good and did not get up.  AR986.  Dr. Smith attempted to challenge her to be timely, take care of herself, and do what is requested even though she did not always feel like it.  AR986.  Dr. Smith stated Ms. Wyman "appears to be feeling rather victimized. . ."  Dr. Smith stated Ms. Wyman portrayed herself as a victim and was having a hard time taking responsibility for what she could do to change her life and make it better.  AR986.  Dr. Smith attempted to help Ms. Wyman realize that she needed to take the initiative.  AR986.  Ms. Wyman

said she was supposed to go to work that day, but was late so she did not go. AR986. Dr. Smith encouraged her to continue to apply for jobs, perhaps something she could do later in the day, but "[t]o this she is quick to dismiss and is looking forward to getting on disability. . ." AR986.

Ms. Wyman was seen for a psychiatric medication management visit on December 4, 2014, and she reported not doing well with her mood changing up and down quite a bit, poor to fair appetite, and poor to fair concentration. AR812, 815. She had additional medication management visits on February 4, 2015; April 6, 2015; and June 15, 2015. AR973, 984, 993.

Ms. Wyman was seen for individual counseling on June 22, 2015, and reported things were terrible. AR988. She said she was angry and had told her kids they had to leave, she had called her mother and left a message telling her she hated her, and she reported feeling overwhelmed and said she was leaving to go over to Avera. AR988. The therapist urged her to have an assessment done. AR988.

Ms. Wyman was seen for individual counseling on July 2, 2015, and reported that she had been hospitalized at Avera Behavioral Health. AR990. She described having problems during the hospitalization such as being frustrated with how some things were handled, having fits when other group therapy participants were not prepared, or when she was not allowed to go to the gym when she wanted. AR990. She said she did not want to leave and return to her dreary house, and felt stuck, helpless and doomed. AR990.

Ms. Wyman was seen for a psychiatric medication management visit on September 29, 2015, and reported things were really difficult, she felt like she had "shut down," she showered that day for the first time after four days, she was really depressed and had a lot of pain and fatigue. AR995.

Ms. Wyman was seen for a psychiatric medication management visit on February 10, 2016, by Rachelle Broveleit, PA-C. AR1043. She reported that "life sucks" and her mood had been up and down. AR1043. She had not been going to therapy but was planning to see "Eric" who helps her with her "STEPPS" group. AR1043. She reported not wanting to leave her house, having no motivation, constant sadness, frequent guilt, a lot of anger and irritability and occasional feelings of anhedonia. AR1043. She reported some thoughts of wishing her life was over, but had no plan. AR1043-44. The diagnosis was moderate episode of recurrent major depressive disorder and her Zoloft dosage was increased. AR1048.

Ms. Wyman was seen for a psychiatric medication management visit on March 23, 2016, and reported ongoing symptoms of thoughts of hurting herself, thoughts of cutting, thoughts of wishing her life was over and killing herself, but had no plan, poor attention and concentration, sadness, irritability, and feelings of hopelessness, helplessness, worthlessness, and guilt. AR1126. Her mental status exam included fair judgment, good attention, sad and anxious mood, and depressed and anxious affect. AR1129. Ms. Wyman also needed some paperwork completed for her disability case. AR1126.

On March 24, 2016, Rachelle Broveleit, PA-C, one of Ms. Wyman's treating mental healthcare providers, completed a medical source statement regarding Ms. Wyman's ability to do work-related mental activities utilizing a form provided by the Social Security Administration.  AR964-66.  Ms. Broveleit stated that Ms. Wyman was completing her disability paperwork and "we are working on filling out some paperwork to help them today."  AR1126.

Ms. Broveleit stated that if Ms. Wyman attempted sustained full-time work, eight hours per day, five days per week, or an equivalent work schedule, week after week, she would have extreme limitations in understanding, remembering, and carrying out complex instructions, marked limitations in her ability to understand, remember, and carry out simple instructions, and make judgments on complex work-related decisions, and moderate limits in making judgments on simple work-related decisions.  AR964.  Ms. Broveleit explained that Ms. Wyman gets flustered very easily, and when this happens she gets distracted, which then causes her to have poor memory and poor execution of tasks.  AR964.

From a social standpoint Ms. Broveleit stated Ms. Wyman was extremely limited in her ability to respond appropriately to usual work situations and changes in a routine work setting, markedly limited in her ability to interact appropriately with supervisors and co-workers, and moderately limited in her ability to interact with the public. AR965.  Ms. Broveleit explained that

Ms. Wyman is exceedingly emotionally sensitive, she struggles with being appropriate and polite to others, and she struggles being sensitive to others' feelings. AR965.

Ms. Broveleit also stated Ms. Wyman struggles with consistency and can have many different attitudes or personalities in a day depending on how she feels and what happens, and that she struggles with chronic pain and fibromyalgia, which limits abilities in sitting and standing. AR965. Ms. Broveleit concluded, "[i]n meeting with Teresa on a regular basis, it is easy to see that she struggles with consistency in her relationships. With her pain issues, she often cannot function, even at home, due to her distraction from physical limitations." AR965.

### 7. Avera Behavioral Health Hospital

Ms. Wyman was seen for a mental health assessment on June 23, 2015, by a social worker. AR851. She was admitted for suicidal thoughts including crashing her car, overdosing on medications, or slashing her wrists. AR857. She was discharged June 30, 2015, and was to enroll in the STEPPs program to help regulate borderline tendencies. AR860. The progress notes from June 27, 2015, describe Ms. Wyman having significant issues with how she was cared for during her hospitalization, and her strong desire to "tell her story" about her 25 years of therapy and her problems and what made her the way she was, and the record noted it was very difficult to get her off that track and trying to focus her on the future and creating a new chapter in her life. AR892.

Ms. Wyman attended some group sessions of the STEPPs program from July 23, 2015, through March 21, 2016, and attempted individual outpatient therapy.  AR920.

### 8.     State Agency Assessments

The opinions of the state agency physician experts at both the initial level and reconsideration level are not relevant because they were rejected by the ALJ.  AR37. The ALJ rejected the state agency physician opinions that Ms. Wyman could perform a range of light duty work, giving their assessments little weight because evidence submitted after their assessments showed Ms. Wyman was more limited.  AR37.  The commissioner disputes that this sentence constitutes a material statement of fact.

The opinions of the state agency psychological experts at both the initial level and reconsideration level are not relevant because they were rejected by the ALJ. AR37. The ALJ rejected the state agency psychological expert opinions that Ms. Wyman's mental impairments were non-severe, giving the assessments little weight because the assessments were inconsistent with subsequent evidence.  AR37.  The commissioner disputes that this sentence constitutes a material statement of fact.

### D.     Testimony at ALJ Hearing

### 1.     Ms. Wyman's Testimony

Ms. Wyman testified her only income was child support, and she received housing assistance, food stamps, and medical assistance. AR51.

Ms. Wyman testified she was 5'6" tall and weighed 235-240 pounds. AR52.

Ms. Wyman testified that her last work was a job evaluation through voc rehab at Goodwill where she hung up clothes. AR53. She said she was given a stool to sit on because she needed to sit, but it was hard to hang clothes on a rack sitting down, and she was given extra breaks. AR54. When asked about what happened and whether she was recommended for job placement, she said, "I had to stop for a while to figure stuff out and try to move and try to keep all that straight, but at my review that said I had been late for work, but they said I did a good job when I worked." AR53. Ms. Wyman said she did not have problems with her supervisors during training, but she got "pretty mouthy" at the meeting at the end, and was upset and confused. AR73.

Ms. Wyman testified that her work at Volunteers of America in 2009 was part-time work. AR55.

Ms. Wyman testified that she had chronic pain all over her body and fatigue related to fibromyalgia, and she gets overwhelmed with things and has a hard time with change. AR57-58. She testified that on a day where she did not do too much physically and was able to sit, stand or lay down as needed and took her gabapentin her pain would be 4-8 out of 10. AR59-60. She said if she was more active her pain was worse and explained for example if she went to the grocery store she does not even make it through one-third of the store. AR60. She said if she vacuums more than a couple minutes or tries to sweep her bathroom the pain gets worse. AR60.

Ms. Wyman testified she had problems with her right knee, which had been feeling pretty good until she tried to work at Goodwill the prior summer, and she wanted a knee replacement but the doctor said no because of her fibromyalgia, mental health and weight. AR62. When asked if she could do that job for an eight-hour day, she said she could barely do it for three to four hours shifts, and that was only a total of ten to twelve hours per week. AR65.

Ms. Wyman testified that when she worked at Western Surety she had migraines, and she started getting a lot of pain in her arm, in the elbow area. AR66. She testified that she had seen a neurologist in the past for her migraines and tried "Topamax and stuff" and now uses generic Imitrex and Zofran for the nausea. AR68-69. When asked how often she takes Imitrex, she said she only gets nine pills per month so she had to "pick and choose how you're going to suffer or not suffer." AR69. When she has a migraine, she said she lays down and uses ice packs. AR69. Ms. Wyman testified that the time laying down varied depending on if she was also nauseous, but would usually be a few hours. AR70. She said she had headaches five to seven days per week, and migraines two to four of those times. AR70.

When asked about sitting Ms. Wyman said she could sit about an hour and then would need to get up, move around and stretch. When asked about standing to do dishes she said it depended on the day and her pain, sometimes five minutes, sometimes 15 minutes. AR64. When asked about lifting, Ms. Wyman said she did not know what a gallon of milk weighed, but it was heavy for her to lift. AR66.

Ms. Wyman testified she does not bother with cleaning anymore unless it is absolutely necessary and her daughter does the laundry.  AR72.

### 2.      Vocational Expert Testimony

The ALJ asked hypothetical questions to the vocational expert ("VE") that in combination matched the RFC identified in the decision and the VE testified the individual would not be able to perform any of the past work he had identified.  AR82-84.  The VE testified there would be other jobs the person could perform and identified final products assembler, DOT# 713.687-018 with 250 positions in the four-state region of Minnesota, Iowa, North Dakota and South Dakota; printed circuit board screener, DOT# 726.684-110 with 300 positions in the same region; and stone setter, DOT# 735.687-034 with 250 positions in the same region.  AR83-84.

The VE testified that if a person due to pain and psychologically based symptoms was off task 20 percent or more of the workday or absent more than two days per month, they would not be able to work competitively.  AR85.

### E.      Other Evidence

Ms. Wyman submitted to the Appeals Council a Student Loan Discharge Application and finding of total and permanent disability by the US Department of Education, dated November 1, 2016, which included a physician's certification from her treating physician, Dr. Jensen, which stated Ms. Wyman was unable to perform substantial gainful activity and identifying numerous mental and physical limitations, including limitations in prolonged

sitting, standing, and significantly depressed mood due to PTSD, major depression, borderline personality disorder and chronic pain.  AR9-12.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627.   The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Woolf v. Shalala 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents

the Commissioner's findings, the Commissioner must be affirmed.  <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.  Erroneous interpretations of law will be reversed.  <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  <u>Smith</u>, 982 F.2d at 311.

**B.      The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318 at 1320, n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine
whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the

applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 1520(f).

## C.      Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five.  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.      The Parties' Positions

Ms. Wyman asserts the Commissioner erred in three ways in concluding she was not disabled within the meaning of the Social Security Act:  (1) the Commissioner failed to properly identify Ms. Wyman's severe impairments; (2)

40

the Commissioner failed to properly evaluate whether Ms. Wyman's fibromyalgia was equivalent in severity to a listed impairment; and (3) the Commissioner's determination of Ms. Wyman's RFC is not supported by substantial evidence. The Commissioner asserts substantial evidence supports the ALJ's determination that Ms. Wyman was not disabled during the relevant time frame and the decision should be affirmed.

### E. Whether the Commissioner Failed to Properly Identify Ms. Wyman's Severe Impairments?

Ms. Wyman asserts the Commissioner failed to identify her migraine headaches as a severe impairment. Ms. Wyman claims this failure fatally infected the remainder of the Commissioner's disability analysis.

In its written decision, the ALJ identified migraine headaches as a non-severe impairment. AR27. In support of this finding, the ALJ stated

> The claimant has been diagnosed with migraines (Ex 6F). The claimant testified that she had migraines up to four times per month, had headaches another 5 to 7 times per week and received 9 tablets of Imitrex per month (hearing testimony). Those allegations are not well-supported by the record and the undersigned does not see the frequency, duration and severity of the claimant's migraines as alleged. Therefore, the undersigned finds this impairment to be non-severe.

Id.

Ms. Wyman asserts the ALJ's should have found her migraines to be a severe impairment. Ms. Wyman alleges the ALJ misstated her testimony about the frequency of her headaches/migraines, and did not cite any part of the record to support its claim that her testimony about the severity of her migraines was unsupported by the medical records. Further, Ms. Wyman

directs the court's attention to the following evidence in the record which she

alleges supports her testimony:

- Ms. Wyman testified she had headaches five to seven days a week, and between two and four of those times they were migraines. AR70.

- She had seen a neurologist in the past and tried other medications, and was now using Imitrex, which was limited to nine pills per month, so she had to pick and choose when to use them.  AR69.

- She also uses Zofran for the nausea that is related to her migraines, and she must lie down and use ice packs.  AR69.

- The amount of time she was required to lie down depended upon whether she was also nauseous, but it was usually a few hours. AR70.

- Other record evidence regarding Ms. Wyman's migraines is contained in her disability application, where she listed migraines as one of the impairments causing her disability.  AR27, 227, 237, 281, 283.

- One of the very early medical records in the administrative record is an emergency room record from March, 2009, wherein Ms. Wyman was admitted for a severe migraine with vomiting. AR389.

- She indicated at that time that she was getting the headaches monthly.  Id.

- She was treated in the emergency room for a migraine again four months later (in July, 2009,) and the migraines were described as a "recurrent" problem for Ms. Wyman.  AR386.

- Ms. Wyman's primary care records contain information about her headaches/migraines beginning in 2010.  AR697, 691.

- Her treatment records include notes indicating she refilled her prescription for Imitrex, the medication she used to treat her migraine headaches.  AR631, 1064, 1147, 1167.

- When Ms. Wyman saw Dr. Jensen in November, 2013, she reported to Dr. Jensen that her migraines had increased.  AR597.

- Ms. Wyman again reported increased migraines to Dr. Jensen in November, 2014.  AR816.

- Dr. Jensen mentioned Ms. Wyman's migraines in the September, 2016, and October, 2016, letters which were submitted to the Appeals Council in which Dr. Jensen indicated she believed Ms. Wyman was unable to work.  AR15-20.

- On January 24, 2014, Ms. Wyman saw a mental health counselor for stress and pain management and she reported that migraines and fibromyalgia were her most troubling problems at that time.  AR588.

Ms. Wyman offers the above record evidence in further support of her own testimony regarding her migraine symptoms, and in support of her argument that her migraines should have been deemed a severe impairment by the ALJ.

"It is the claimant's burden to establish that his impairment or combination of impairments are severe." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).   A severe impairment is defined as one which significantly limits a physical or mental ability to do basic work activities.  20 C.F.R. § 1521. An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby, 500 F.3d at 707.  "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." Id. (citation omitted). The claimant bears the burden of showing a severe impairment significantly limits a physical or mental ability to do basic work activities, "but the burden of

a claimant at this stage is not great." <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001). Additionally, the impairment must have lasted at least twelve months or be expected to result in death. <u>See</u> 20 C.F.R. § 404.1509.

Ms. Wyman cites <u>Nicola v. Astrue</u>, 480 F.3d 885, 886-87 (8th Cir. 2007), for the proposition that the failure to identify a severe impairment at step two is not harmless error but is instead grounds for reversal. In <u>Nicola</u>, the severe impairment the claimant alleged the ALJ failed to identify was borderline intellectual functioning. <u>Nicola</u>, 480 F.3d at 887. The Eighth Circuit noted when such a diagnosis is supported by sufficient medical evidence, it should be considered severe. <u>Id.</u> The court held the ALJ's failure to identify the impairment as severe was not harmless error. <u>Id.</u> The court reversed and remanded the case to the commissioner for further proceedings. <u>Id</u>.

As noted in <u>Lund v. Colvin</u>, 2014 WL 1153508 (D. Minn. Mar. 21, 2014), the district courts within the Eighth Circuit are not in agreement about the holding of <u>Nicola.</u> Some courts have interpreted it to mean that an ALJ's erroneous step-two failure to include an impairment as severe warrants reversal and remand, even when the ALJ found other impairments to be severe and therefore continued sequential analysis. Other courts have declined to interpret <u>Nicola</u> as establishing a *per se* rule that any error at step two is reversible error, so long as the ALJ continues with the sequential analysis. <u>See</u> <u>Lund</u> 2014 WL 1153508 at *26 (gathering cases). The central theme in the cases which hold reversal is not required is that "an error at step two may be harmless where the ALJ considers all of the claimant's impairments in the

44

evaluation of the claimant's RFC." Lund, 2014 WL 1153508 at *26. In the absence of clear direction from the Eighth Circuit, this is the course which has generally been followed by this court. See Chapman v. Colvin, 2016 WL 8117951 at *25 (D.S.D. Dec. 16, 2016).

Ms. Wyman argues that the ALJ's failure to consider her headaches as a severe impairment is not harmless error in her case, because the ALJ's analysis was completely silent as to what effect, if any, her headaches had upon her RFC at step four. The court therefore endeavors to determine whether the ALJ erred by failing to categorize Ms. Wyman's headaches as a severe impairment and if so, whether that error in this instance constitutes reversible error under Nicola as interpreted through the lens of Lund.

The "failure to consider a known impairment in conducting a step-four inquiry is, by itself, grounds for reversal." Spicer v. Barnhart, 64 Fed. Appx. 173, 178 (10th Cir. 2003). See also Washington v. Shalala, 37 F.3d 1437, 1439-40 (10th Cir. 1994) ("failure to apply the correct legal standard . . . is grounds for reversal. We note that the ALJ failed to consider the Plaintiff's [impairment] in conducting the step-four inquiry. This failure, alone, would be grounds for reversal."). See also Pratt v. Sullivan, 956 F.2d 830, 834-35 (8th Cir. 1992) (same).

More recently, this district court has interpreted Nicola to require reversal for failure to properly identify a severe impairment at step two, when that impairment is diagnosed and properly supported by sufficient medical evidence. See Quinn v. Berryhill, 2018 WL 1401807 at **5-6 (D.S.D. Mar. 20,

45

2018) (error at step two not harmless where ALJ failed to identify medically determinable impairments). In <u>Quinn</u> the court acknowledged the district court split within the Eighth Circuit as described in <u>Lund</u>, but decided that in Ms. Quinn's case, the error was not harmless. <u>Id.</u>

> Here, the ALJ did not mention Quinn's obesity, and he did not make a finding as to whether Quinn's scoliosis or neck impairment—which he noted Quinn testified about—were medically determinable impairments that were either severe or not severe. There is evidence in the record to support such diagnoses, so they should have been addressed in the step two analysis. Because medically determinable impairments are so important to the RFC analysis at step four, the court finds that the ALJ's insufficient findings regarding Quinn's medically determinable severe impairments at step two require remand for further development.

<u>Id.</u> at *6.

In <u>Quinn</u>, the court noted the claimant's burden to demonstrate a severe medically determinable impairment at step two, but emphasized the burden is not difficult to meet and any doubt about whether the claimant has met her burden is resolved in favor of the claimant. <u>Quinn</u>, at *5 (citing <u>Kirby</u>, 500 F.3d at 707; <u>Caviness</u>, 250 F.3d at 605; and <u>Dewald v. Astrue</u>, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28)).

In this case, the ALJ acknowledged Ms. Wyman's headaches as a legitimate medical impairment, but the court agrees that the reasons cited by the ALJ for categorizing headaches as non-severe are not supported by substantial evidence. The first reason cited by the ALJ for categorizing Ms. Wyman's headaches as non-severe is that her testimony regarding her headaches was not well supported by the record. But Ms. Wyman has directed

this court to record evidence which does support her testimony—record evidence which was not acknowledged by the ALJ.

Next, the ALJ stated it did not see the frequency, duration and severity of Ms. Wyman's headaches as alleged by Ms. Wyman to be borne out by the record.  But Ms. Wyman has directed the court's attention to medical records showing she treated for migraine headaches in the emergency room beginning as early as 2009, and showing that she continued to take Imitrex for migraine headaches during the course of her treatment with her regular physician (Dr. Jensen).  Dr. Jensen mentioned migraines as one of Ms. Wyman's disabling conditions in her 2016 letters to the Appeals Council.

Ms.  Wyman frequently reported her headaches to her medical providers and/or sought treatment for them during the relevant time frame, including receiving medication See record evidence cited above.

The Commissioner argues that any error at step two was harmless, because there were no limitations upon Ms. Wyman's work abilities which were necessitated by her migraines.   In other words, even though the ALJ identified Ms. Wyman's migraines as an impairment, the Commissioner argues, there is no evidence in the record that the migraine headaches had any effect whatsoever on her ability to work, so there was no error committed by the ALJ's silence in the RFC formulation regarding any accommodation which might be necessitated by Ms. Wyman's headaches.

This conclusion cannot be discerned, however, from the ALJ's written decision.  The ALJ's recitation of  Ms. Wyman's RFC (recited verbatim above on

47

page five of this opinion) did not include any mention of whether Ms. Wyman's functional capacity was affected at all by limitations presented by her headaches. Because the ALJ's own analysis deemed Ms. Wyman's headaches a medically determinable impairment, the ALJ was required to consider the effects of Ms. Wyman's headaches when formulating her RFC—even though the ALJ's analysis considered the headaches a non-severe impairment.

But because the headaches were not mentioned at all in the ALJ's discussion regarding the RFC, it is impossible to determine whether any limitation within the RFC was attributed to Ms. Wyman's headaches. In the part of its written decision wherein the ALJ determined Ms. Wyman's headaches were a non-severe impairment, the ALJ cited the reasons it did not believe Ms. Wyman's headaches more than "minimally" limited her ability to work. AR27. Ms. Wyman testified she had migraines between two and four times a week and that when she did, she needed to lie down for two hours AR69-70. Because the headaches were accepted by the ALJ as a medically determinable impairment but not otherwise discussed, the court is left to speculate about what the ALJ considered a "minimal" effect on Ms. Wyman's ability to work. The ALJ did not discount the existence of migraines altogether because it accepted them as a medically determinable impairment.

Perhaps a minimal effect on her ability to work means only two migraines per week, or perhaps it means one instead of four. Or perhaps it means she needs to lie down for only fifteen minutes instead of two hours, as she testified. (Ms. Wyman described in her hearing testimony that when she had a migraine,

48

she needed to lie down and use an ice pack.  The ALJ suggested a time frame of fifteen minutes to lie down, but Ms. Wyman stated she needed to lie down for two hours).

But the RFC analysis makes no mention of *any* affect that Ms. Wyman's migraine headaches, or lack thereof, on Ms. Wyman's ability to work.  The court is left to speculate, therefore, about why this is so.  This case must be remanded for clarification of this issue.  Only then can this court sufficiently review the Commissioner's decision.  <u>Nicola</u>, 480 F.3d at 887; <u>Parker-Grose v. Astrue</u>, 462 Fed. Appx. 16 (2d Cir. 2012) (Commissioner's assertion that failure to find mental impairment severe at step two was harmless was "unavailing" because "having found that any functional limitations associated with [claimant's] mental impairment were mild and only minimally affected her capacity to work, the ALJ did not take these restrictions into account when determining her [RFC]."

**F.      Whether the Commissioner Failed to Properly Evaluate Whether Ms. Wyman's Fibromyalgia was Equivalent in Severity to a Listed Impairment?**

Next, Ms. Wyman asserts the ALJ failed to properly evaluate her fibromyalgia impairment at step three of the analysis because it failed to properly apply Social Security Ruling (SSR) 12-2p.  Specifically, Ms. Wyman asserts that because her fibromyalgia did not meet or equal the listings considered by the ALJ (Listing §§ 1.02A and 1.02B for major dysfunction of upper and lower extremity joint disorders), under SSR 12-2p, the ALJ was

required to evaluate whether her fibromyalgia was medically equivalent to Listing § 14.09D (inflammatory arthritis).

Social Security Ruling 12-2p instructs the Social Security Administration how to develop evidence in cases where a claimant alleges fibromyalgia as one of their medically determinable impairments. Part of the SSR includes instruction to the SSA on how to evaluate fibromyalgia claims at step three of the five-step sequential evaluation process (the Listings). The SSR states, in relevant part:

> VI. How do we consider FM in the sequential evaluation process?
>
> As with any adult claim for disability benefits, we use a 5-step sequential evaluation process to determine whether an adult with an MDI of FM is disabled.
>
> ***
>
> C. At Step 3, we consider whether the person's impairment(s) meets or medically equals the criteria of any of the listings in the Listing of Impairments in appendix 1, subpart P, of 20 CFR part 404 (appendix 1). FM cannot meet a listing in appendix 1 because FM is not a listed impairment. At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.

See SSR 12-2p at Section VI.C.

Because there is no listing for fibromyalgia, therefore, Ms. Wyman asserts the ALJ should have, but did not, analyze whether her fibromyalgia met or equaled Listing § 14.09D as the basis for an award of disability benefits at step three.

Listing § 14.09D requires that Ms. Wyman show (1) inflammatory arthritis as described in listing 14.00D6 and (2) repeated manifestations of inflammatory arthritis, with at least *two* constitutional symptoms (severe fatigue, fever, malaise, or involuntary weight loss), and *one* of the following at the *marked* level: (a) limitation of activities of daily living, (b) limitations in maintaining social functioning, or (c) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. See Listing § 14.09D.

To satisfy the first prong of the test for Listing § 14.09D, Ms. Wyman must satisfy the listing for inflammatory arthritis found at listing 14.00D6. This listing covers a "vast array of disorders that differ in cause, course, and outcome." See Listing § 14.00D6. Subpart 6(e)(ii) of Listing § 14.00D states that listing-level severity is shown in Listing § 14.09D "by inflammatory arthritis that involves various combinations of complications of one or more major peripheral joints or other joints, such as inflammation or deformity, extra-articular features, repeated manifestations, and constitutional symptoms or signs. Extra-articular impairments may also meet listings in other body systems." Id. In subpart 6(e)(iii), Listing § 14.00D6 goes on to state that "extra-articular" inflammatory arthritis features may involve any body system, including musculoskeletal, ophthalmologic, pulmonary, cardiovascular, renal, hematologic, neurologic, mental, and immune system. Id.

To satisfy the second prong of the test for Listing § 14.09D, four showings must be made: (1) repeated manifestations of inflammatory arthritis

51

as described above, (2) & (3) two of the listed symptoms and (4) one of the listed limitations at the "marked" level. Id. The evaluation of whether Ms. Wyman meets or equals the listing at § 14.09D should be made in the first instance by the ALJ. The ALJ did not consider Listing § 14.09D in its analysis and there are many unanswered questions about the applicability of that Listing to Ms. Wyman's impairments that should be answered first by the ALJ.

Fibromyalgia *was* presented by the record, and the ALJ acknowledged it was a severe impairment. Because it was acknowledged as a severe impairment and did not meet or equal any other Listed impairment, the ALJ should have analyzed it under Listing § 14.09 pursuant to SSR 12-2p.

The Commissioner asserts that because the ALJ evaluated Ms. Wyman's physical impairments under Listings § 1.02A and § 1.02B and because the ALJ evaluated Ms. Wyman's mental impairments under Listings § 12.04 (affective disorders); § 12.06 (anxiety disorders); and § 12.08 (personality disorders), its failure to perform the analysis as to fibromyalgia under § 14.09D is harmless. This is so, argues the Commissioner, because the ALJ's analysis under § 14.09D would have had the same result as it did under the Listings for Ms. Wyman's mental impairments, because the ALJ made findings sufficient to preclude a § 14.09D Listing based upon its finding that the B criteria were not met for the §§ 12.04, 12.06 and 12.08 mental impairments.

A careful reading of the ALJ's step three analysis, however, requires the court to reject this argument. The step-three analysis requires the ALJ to determine whether an impairment *or combination of impairments* meets or

52

equals a Listing. The introductory sentence to the ALJ's findings for the step-three analysis emphatically states the ALJ "has examined all the impairments *listed* in 20 C.F.R. Part 404, Subpart P, Appendix 1 . . ." (emphasis added). As discussed above, fibromyalgia is *not* a Listed impairment. And, the ALJ did not mention or discuss whether it considered fibromyalgia *in combination with* the specifically Listed impairment under consideration when determining whether that Listed impairment met or equaled the Listing requirements.

This leaves the court unable to determine whether it considered Ms. Wyman's severe fibromyalgia impairment *at all* at the step-three level of the sequential evaluation. The court is therefore unable to discern whether fibromyalgia was among the impairments or "combination of impairments" that was considered at all at step three of the sequential evaluation, let alone included in the ALJ's determination that the "B" criteria were not met for Listing §§ 12.04, 12.06 and 12.08.

When the court is unable to determine how the ALJ evaluated fibromyalgia at step three, the matter must be remanded. The district courts in this district have consistently interpreted SSR 12-2p to require as much. See e.g. Jockish v. Colvin, 2016 WL 1181680 at *7 (D.S.D. Mar. 25, 2016); Sunderman v. Colvin, 2017 WL 473834 at *7 (D.S.D. Feb. 3, 2017); Wheeler v. Berryhill, 2017 WL 4271428 at **3-4 (D.S.D. Sept. 26, 2017).

In each of these cases, the district court remanded for the ALJ's failure to evaluate at step three whether the claimant's fibromyalgia met or equaled a Listing by comparing it to Listing 14.09D—as instructed in SSR 12-2p.

Jockish, 2016 WL 1181680 at *7; Sunderman, 2017 WL 473834 at *7; Wheeler 2017 WL 4271428 at **3-4. In Wheeler, the court explained,

> It is clear the Social Security Administration intended an ALJ to evaluate fibromyalgia under Listing 14.09D. "Social Security Regulations . . . 'are binding on all components of the Administration.'" Carter v. Sullivan, 909 F.2d 1201, 1202 (8th Cir. 1990) (citing 20 C.F.R. § 422.408)). The "agency's failure to follow its own binding regulations is a reversible abuse of discretion." Id. The ALJ's finding cannot be sustained because an error of law occurred.

Wheeler, 2017 WL 4271428 at *4. In this case, as in Jockish, Sunderman, and Wheeler, it is impossible for this court to analyze whether the ALJ's reasoning regarding medical equivalence is sound. Wheeler, at *4. For this reason, this case must be remanded for a proper step-three analysis pursuant to SSR 12-2p.

**G.      Whether The Commissioner's Formulation of Ms. Wyman's RFC is Supported by Substantial Evidence?**

For her final point of error, Ms. Wyman asserts the ALJ's RFC formulation is not supported by substantial evidence. This point of error has two subparts: (1) that the ALJ did not properly evaluate Ms. Wyman's fibromyalgia impairment; and (2) that the AJL's RFC formulation was not supported by substantial medical evidence in the record. These sub-arguments are discussed separately below.

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and

continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)."

Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The

formulation of the RFC has been described as "probably the most important

issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147

(8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222

F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's

mental and physical impairments in combination, including those impairments

that are severe and those that are nonsevere.  Lauer, 245 F.3d at 703; Social

Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the

ALJ "bears the primary responsibility for assessing a claimant's residual

functional capacity based on *all* the relevant evidence . . . a claimant's residual

functional capacity is a medical question."[6]  Lauer, 245 F.3d at 703 (citations

omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support

the determination of the claimant's RFC, and the ALJ should obtain medical

_____

[6] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p.

evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every

reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

### 1. Whether the Commissioner Properly Evaluated Ms. Wyman's Fibromyalgia?

Ms. Wyman asserts the Commissioner's RFC formulation is flawed in part because the ALJ did not properly evaluate her fibromyalgia symptoms. Specifically, Ms. Wyman asserts the ALJ relied too heavily on the absence of traditional objective medical findings to determine the credibility of her fibromyalgia complaints instead of following the directives found in SSR 12-2p. Therefore, Ms. Wyman argues, even though the ALJ purported to accept

fibromyalgia as a severe impairment, the ALJ improperly discounted her

fibromyalgia symptoms when formulating her RFC.[7]

Ms. Wyman cites the following statements from the ALJ's discussion

regarding this subject:

- The ALJ noted that in May, 2010, Ms. Wyman was seen for fibromyalgia pain, but emphasized the physical examination observations noted that she had no edema or deformities. AR30.

- The ALJ noted that when she was seen in October, 2012, Ms. Wyman complained of fatigue and generalized pain, but that she was noted to have a generally normal examination with no focal findings. AR31.

- When the ALJ discussed Ms. Wyman's rheumatology exam in October, 2012, the ALJ confirmed Ms. Wyman's fibromyalgia diagnosis, but emphasized that the exam showed no edema, normal muscle mass, intact reflexes, no joint tenderness, no spinal tenderness, and negative straight leg raise testing. AR31. The only fibromyalgia symptom mentioned by the ALJ was the presence of tenderpoints in nine areas. Id. The rheumatologist noted tenderpoints bilaterally in those nine areas (nine times two) and the rheumatologist's assessment was generalized myalgias, headaches, tenderpoints, IBS symptoms, and fatigue, all consistent with fibromyalgia. AR650.

- The ALJ noted Ms. Wyman was seen in February, 2014, for an exacerbation of her fibromyalgia symptoms, and again focused on

---

[7] The Commissioner asserts the ALJ properly discounted Ms. Wyman's fibromyalgia symptoms because her orthopedic physician noted that her pain complaints about her knee were out of proportion to the objective findings, and that another of her physicians noted her determination to obtain disability benefits. These were not reasons noted by the *ALJ* in discounting Ms. Wyman's claimed fibromyalgia symptoms, so they cannot be claimed by the Commissioner now. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (reviewing court is limited to reaching its judgment solely on the grounds invoked by the agency and not on *post hoc* rationalizations); Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001) (same).

the findings of a normal gait, intact reflexes, no obvious joint swelling, and no limited range of motion. AR31.

- The ALJ noted Ms. Wyman was seen for follow-up on her fibromyalgia in May, 2016, and noted she was in no distress, had no edema, and had 11 of 18 tenderpoints positive for fibromyalgia. The ALJ then concluded, "[t]he physical examination observations in the record support a finding for a range of sedentary work activity." AR32.

- The ALJ did not note the treating physician's note in the May, 2016, record that Ms. Wyman had the classic symptoms of fibromyalgia including chronic generalized pain, fatigue, sleep/mood disturbances, headaches, IBS, multiple tender areas of muscles and tendons, and no history of inflammatory muscle or joint disease. AR1172. Dr. Jensen also noted Ms. Wyman's pain was worse with exertion, stress, lack of sleep and weather changes, and her history was not suggestive of other disorder such as rheumatoid arthritis, osteoarthritis, or SLE. AR1172.

- Dr. Jensen noted Ms. Wyman was taking Tramadol at higher than prescribed dosage due to pain, and she was at the maximum dosage of Neurontin. All of Dr. Jensen's observations were consistent with the fibromyalgia signs, symptoms or co-occurring conditions as defined in SSR 12-2p, but none were discussed by the ALJ.

The Eighth Circuit has noted that fibromyalgia is a disease which is "chronic, and diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests . . . We have long recognized that fibromyalgia has the potential to be disabling." Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004) (citations omitted, punctuation altered).

Where the ALJ rejected a claimant's fibromyalgia symptoms and complaints because they were not "substantiated by objective medical testing" the Eighth Circuit reversed and remanded the case because the ALJ "misunderstood fibromyalgia" which likewise adversely affected the ALJ's

formulation of the claimant's RFC analysis.  Garza v. Barnhart, 397 F.3d 1087,

1089 (8th Cir. 2005).

> Fibromyalgia is defined as a syndrome of chronic pain of
> musculoskeletal origin but uncertain cause.  Stedman's Medical
> Dictionary, at 671 (27th ed. 2000).  Further, "[t]he musculoskeletal
> and neurological examinations are normal in fibromyalgia patients,
> and there are no laboratory abnormalities."  Harrison's Principles
> of Internal Medicine, at 2056 (16th ed. 2005).  The American
> College of Rheumatology nonetheless has established diagnostic
> criteria that include "pain on both sides of the body, both above
> and below the waist, [and] point tenderness in at least 11 of 18
> specified sites."  Stedman's Medical Dictionary, supra.

Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2010).

In Johnson, as in this case, the treating physician's opinion regarding

the claimant's fibromyalgia and its effect on her ability to work was not given

controlling or even significant weight.[8]  Johnson, 597 F.3d at 412.  The ALJ

rejected the opinion because it relied primarily upon the claimant's subjective

complaints and lacked supporting objective medical findings.  Id.  Because of

the unique nature of fibromyalgia, however, the First Circuit criticized the

ALJ's reasons for giving little weight to the treating physician's opinion:

> Dr. Ali's "need" to rely on claimant's subjective allegations . . . was
> not the result of some defect in the scope or nature of his

--------

[8] In this case, Dr. Jensen's opinion letters were not ever considered by
the ALJ because they were not introduced into the administrative record until
after the ALJ issued its decision.  Dr. Jensen's opinion was not submitted until
the Appeal Council stage of the proceedings.  In cases involving submission of
supplemental evidence subsequent to the ALJ's decision, the record may
include evidence submitted after the hearing and considered by the Appeals
Council.  Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000).  "In
practice, this requires [the court] to decide how the ALJ would have weighed
the new evidence had it existed at the initial hearing."  Id.

examinations nor was it even a shortcoming.  Rather, "a patient's report of complaints, or history, is an essential diagnostic tool" in fibromyalgia cases, and a treating physician's reliance on such complaints "hardly undermines his opinion as to [the patient's] functional limitations."  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (internal punctuation and citation omitted).  Further, since trigger points *are* the only "objective" signs of fibromyalgia, the ALJ "effectively [was] requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines," and this, we think, was error.

Id. at 412 (emphasis in original).  The court concluded by finding the RFC formulated by the ALJ was "significantly flawed."  Id.

In Rogers v. Commissioner of Soc. Security, 486 F.3d 234, 250 (6th Cir. 2007), the Sixth Circuit likewise reversed and remanded a fibromyalgia case.  "[U]nlike medical conditions that can be confirmed by objective medical testing, fibromyalgia patients present no objectively alarming signs. . .[F]ibromyalgia is an elusive and mysterious disease which causes severe musculoskeletal pain. . . [F]ibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion."   Id. at 243-44 (citations omitted, punctuation altered).  The Rogers court held the ALJ erred by adopting into the RFC opinions of physicians who dismissed the claimant's complaints because they were not substantiated by objective findings.  Id. at 244-46.  "[I]n light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely on objective evidence are not particularly relevant."  Id. at 245.

As in Garza, Johnson, and Rogers, it appears the ALJ in this case effectively required objective evidence beyond the accepted clinical findings

necessary for fibromyalgia. As such, the ALJ misunderstood Ms. Wyman's fibromyalgia and as a result, it rejected its associated limitations which should have been included in her RFC. Accordingly, the ALJ's formulation of the RFC was "significantly flawed" and this case should be reversed and remanded. <u>Garza</u>, 397 F.3d at 1089; <u>Johnson</u>, 597 F.3d at 412; <u>Rogers</u>, 486 F.3d at 243-44.

Social Security Ruling ("SSR") 12-2p regarding the proper evaluation of fibromyalgia cases went into effect on July 25, 2012, well before the ALJ in this case issued its written decision on September 2, 2016. The Ruling carefully explains the specific criteria that should be considered both to establish the existence of the medical impairment of fibromyalgia and to evaluate the credibility of a claimant's associated subjective pain complaints. "Although Social Security Rulings do not carry the force and effect of the law or regulations, . . . they are binding on all components of the Social Security Administration." <u>Kosyjana v. Commissioner, Social Security Administration</u>, 2014 WL 5308028 at *2 (D. Md. Oct. 15, 2014) (citations omitted, punctuation altered).

The Ruling cautions that when determining the claimant's RFC, the longitudinal record should be considered whenever possible because the nature of fibromyalgia necessarily includes "symptoms . . . that can wax and wane so that a person may have bad days and good days." <u>Id.</u> at p. 8. The Ruling instructs consulting examiners to be aware that fibromyalgia symptoms "may vary in severity over time and may even be absent on some days . . ." <u>Id.</u> at

p. 6.  On remand, the ALJ should clarify how the application of SSR 12-2p affects the evaluation of the medical evidence and the formulation of Ms. Wyman's RFC, including the credibility determination.

### 2. Whether the RFC Formulated by the Commissioner is Supported by Substantial Medical Evidence?

Finally, Ms. Wyman asserts the RFC formulated by the ALJ is not supported by substantial evidence because the ALJ considered, but rejected the opinions of all the medical experts.  Instead of seeking additional input from one of Ms. Wyman's treating physicians or requesting a consultative examination, however, the ALJ drew its own inferences from the medical records regarding the impact of Ms. Wyman's admittedly complex combination of physical and mental impairments.  This, Ms. Wyman argues, the ALJ cannot do.

To decide this portion of Ms. Wyman's argument, the court turns to that portion of the ALJ's written decision regarding the medical opinion evidence supporting the RFC determination, the ALJ stated:

> There is a medical source statement from a non-acceptable, but treating source (Ex. 11F).  If accepted, it would likely show listing level mental health symptoms.  The undersigned affords those statements little weight.  The statements do not show if or how the stated limitations date back to the 2009 alleged disability onset date.  AR35.
>
> **
>
> Turning to the opinion evidence, the undersigned has considered the mental medical source statements submitted by Rachelle Broveleit, P.A.-C. (Ex 11F).  The undersigned notes that Ms. Broveleit is not an acceptable medical source but does have a treating relationship with the claimant.  In March of 2016,

Ms. Broveleit had marked to extreme limitations in the abilities to understand, remember and carry out instructions as well as moderate to extreme limitations in the ability to interact appropriately with supervisors, coworkers and the public. (Ex. 11F, pp. 1-2). The undersigned notes that this form was completed with the assistance of the claimant as documented in the medical evidence of record and appear (sic) to be based on the claimant's subjective complaints and not objective findings. (Ex. 14F, p. 47). Additionally, these limitations are disproportionate to the claimant's level of treatment. Therefore, the undersigned affords these statements little weight.

The undersigned has considered the State agency medical consultants' assessments. (Ex. 3A; 4A; 7A; 8A). The State agency medical consultants are acceptable reviewing medical sources. After reviewing the medical evidence of record, the State agency medical consultants determined the claimant was capable of performing a range of light work activity. (Ex. 3A, pp. 8-10;4A, pp. 8-10; 7A, pp7-9; 8A, pp. 7-9). The undersigned rejects the finding that the claimant is capable of working a range of light work activity. The undersigned finds that evidence admitted at the hearing level has shown the claimant was more limited in than originally determined. Additionally, the State agency medical consultants did not have access to the full longitudinal record through the hearing date and did not have the advantage of seeing the claimant testify to her subjective complaints. Therefore, the undersigned affords the State agency medical consultants assessments little weight.

The undersigned has considered the State agency psychological consultants' assessments. (Ex. 3A; 4A; 7A; 8A). The undersigned notes that the State agency psychological consultants are acceptable reviewing medical sources. After reviewing the medical evidence of record, the State agency psychological consultants found the claimant's mental impairments non-severe. (Ex. 3A, p. 6; 4A, p. 6, 7A, p. 5; 8A, p. 5). The undersigned rejects the findings of non-severity, as those findings are inconsistent with the later treatment notes contained in the record. (Ex. 8F; 9F; 10F; 11F; 12F; 13F; 14F; 15F). Therefore, the undersigned affords little weight to the State agency psychological consultants' assessments of non-severity.

AR36-37.

And, as explained above, the two opinion letters from Dr. Jensen were not reviewed by the ALJ because they were not received into the record until September and October, 2016, after the ALJ issued its decision on September 2, 2016.

Ms. Wyman's criticism regarding the ALJ's formulation of the RFC is that the ALJ "played doctor" when it inserted its own opinion regarding Ms. Wyman's limitations into the formulation. Specifically, the ALJ rejected the state agency physicians' opinions as not restrictive enough because they were inconsistent with Ms. Wyman's updated medical records, but the ALJ also rejected Ms. Wyman's treating physicians' opinions because the ALJ stated they too were inconsistent with Ms. Wyman's treatment history. The final medical opinion that is contained in the administrative record was not before the ALJ, but was submitted later to the Appeals Council. The ALJ therefore rejected all of the medical experts' opinions.

The limitations imposed by the ALJ, therefore, were borne of the inferences drawn by the ALJ's interpretation of the medical records. This practice, however, is "forbidden by law." Pate-Fires v. Astrue, 564 F.3d 935 at 947 (8th Cir. 2009) (citations omitted). Further, when there is no medical evidence in the record the ALJ "cannot simply make something up." Everson v. Colvin, 2013 WL 5175916 at * 20 (D.S.D. Sept. 13, 2013). "[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000). The ALJ must not "succumb to the temptation to play

doctor and make their own independent medical findings." <u>Pate-Fires</u>, 564
F.3d at 947 (citations omitted). An ALJ also "may not draw upon his own
inferences from medical reports." <u>Lund v. Weinberger</u>, 520 F.2d 782, 785 (8th
Cir. 1975); <u>Gober v. Matthews</u>, 574 F. 2d 772, 777 (3d Cir. 1978) ("While an
administrative law judge is free to resolve issues of credibility as to lay
testimony or to choose between properly submitted medical opinions, he is not
free to set his own expertise against that of a physician who testified before
him.").

The Eighth Circuit recently re-affirmed this concept in <u>Combs v.
Berryhill</u>, 878 F.3d 642, 647-48 (8th Cir. 2017). In that case, the ALJ decided
to credit the opinion of one State agency physician over another based upon
the ALJ's own interpretation of the meaning of the phrases "no acute distress"
and "normal movement" in the claimant's treating physician notes. <u>Id.</u> at 646.
The Eighth Circuit agreed with the claimant's argument that the ALJ
overstepped its bounds, because by attaching its own interpretation to those
phrases, the ALJ determined on its own that one State agency physician's
opinion was "more consistent with the record as a whole" and therefore
deserving of greater weight. <u>Id.</u> at 647.

In <u>Combs</u>, the ALJ's self-interpretation of the medical records was
outcome determinative, because had the ALJ given the other State agency
physician's opinion greater weight, the result would have been a finding that
the claimant was disabled based upon the medical-vocational guidelines due to
her age, education and previous work experience. <u>Id.</u> at 646. "By relying on

his own interpretation of what 'no acute distress' and 'normal movement of all extremities' meant in terms of Combs' RFC, the ALJ failed to satisfy his duty to fully and fairly develop the record." Id. at 647.

In this case, the Commissioner cites Julin v. Colvin, 826 F.3d 1082 (8th Cir. 2016), and Kirby v. Astrue, 500 F.3d 705 (8th Cir. 2007), in support of the proposition that the ALJ's determination is supported by substantial evidence because the ALJ relied on "some medical evidence" in reaching its decision. Neither of those cases, however, are helpful to the Commissioner in this instance.

In Julin, the court explained that though the ALJ did not give the treating physician's opinion (Dr. Welsh) controlling weight, it did give those portions of Dr. Welsh's opinions that were well-supported substantial weight. Julin, 826 F.3d at 1089. Likewise, at issue in Kirby was the claimant's disagreement with the way the ALJ weighed the medical opinions. Kirby, 500 F.3d at 709. The court explicitly stated "[i]t is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians." Id. In Kirby, the claimant did not argue that the ALJ erred by relying upon its *own* medical opinion, but instead that the ALJ erred by relying upon the wrong *expert* medical opinion. Here, the ALJ rejected all the medical opinions. For this reason, Ms. Wyman's case will be remanded because the RFC must be supported by some medical evidence. Lauer, 245 F.3d at 703.

**H.     Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Wyman requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly

supports such a finding." <u>Buckner</u>, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. <u>Id.</u>; <u>Cox v. Apfel</u>, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. <u>See also</u> <u>Taylor v. Barnhart</u>, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Plaintiff's motion to reverse and remand the final decision of the Commissioner (Docket 17) is GRANTED. The Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED August 22, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge